# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-0329V**

| | |
|---|---|
| CHARLOTTE J. BRIDGES,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: July 13, 2026 |

*Kelly Elizabeth Elder, Martin & Jones, PLLC, Raleigh, NC, for Petitioner.*

*Mallori Browne Openchowski, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On March 7, 2023, Charlotte J. Bridges filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

19, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to settle the claim, and have now briefed entitlement and damages (ECF Nos. 35-37). For the reasons set forth below, I find that Petitioner's shoulder pain likely began within 48 hours of vaccination, and that she is otherwise entitled to compensation. For damages, I award **$100,000.00** for actual pain and suffering, plus **$3,464.52** for past unreimbursable expenses.

## I. Factual Evidence

### A. Medical Records

Petitioner received a flu vaccine in her right shoulder on October 19, 2021. Ex. 12 at 2. A month later (November 19, 2021), she saw her primary care provider ("PCP") for a routine follow-up appointment concerning several chronic conditions. Ex. 6 at 15-16. The record of that visit does not mention shoulder pain, and an examination of her extremities documented only "no cyanosis, no edema." *Id*. at 16.

Nearly two months after vaccination (December 17, 2021), Petitioner saw her PCP by telehealth, complaining of right arm pain that had been present for six to eight weeks and that she thought started after receiving a flu vaccine. Ex. 6 at 12. Her right upper arm hurt above the elbow, and sometimes the pain awoke her. *Id*. She had experienced some numbness and tingling in three of her fingers, and pain in her hand, and Tylenol did not relieve her symptoms. *Id*. Her PCP prescribed anti-inflammatory medication. *Id*.

Petitioner returned to her PCP the following month (January 24, 2022), reporting that her right upper arm pain persisted and had been present for two and a half to three months. Ex. 6 at 9. Anti-inflammatory medication helped "a little," but her pain was largely unchanged. *Id*. Her PCP refilled the medication and ordered an MRI. *Id*. at 9-10. The MRI was "suggestive of rotator cuff tendinosis with subacromial/subdeltoid bursitis" and "[p]ossible tendinosis and tenosynovitis of the long head of biceps tendon." Ex. 11 at 8.

On February 17, 2022, Petitioner saw orthopedist Robert Keller, M.D., for right shoulder pain that "began after she got a flu shot in October." Ex. 3 at 4. The record of this appointment indicates that Petitioner exhibited full range of motion ("ROM") in her *left* shoulder, but does not address ROM of her *right*, affected shoulder ROM.[3] *Id*. at 5. Dr.

[3] Respondent asserts that this record demonstrates that Petitioner was found to have full ROM – suggesting that both shoulders exhibited full ROM. Resp. at *3, 12. However, as Petitioner points out, the notation "[f]ull range of motion" appears under examination results of Petitioner's *left* shoulder. Ex. 3 at 5; Reply at *2. The section of the record for her right shoulder examination is silent on ROM. As such, I find that this record supports a finding that Dr. Keller found that Petitioner had full ROM of her left shoulder, but either did not examine or did not record examination results of her right shoulder.

Keller assessed her with subacromial bursitis with biceps tendinitis, and administered a steroid injection. *Id*. at 6.

A few weeks later (March 8, 2022), Petitioner returned to Dr. Keller, reporting that her condition was gradually worsening. Ex. 3 at 1-3. He assessed her with right shoulder adhesive capsulitis, noting that he thought her pain resulted from inflammation of the anterior capsule. He explained that the treatment for this is oral anti-inflammatory medication, steroid injections, and physical therapy ("PT"), with surgical options available if those treatments were unsuccessful. *Id*. at 3. It does not appear that any treatment was provided at this appointment.

The following month (April 13, 2022), Petitioner consulted with orthopedist Mark Brazinski, M.D., for treatment of right shoulder pain. Ex. 4 at 3. She stated that her symptoms had been present for five months since receiving a flu vaccine in October 2021. *Id*. at 5. Her pain was worse with reaching, and woke her at night. *Id*. Anti-inflammatory medication upset her stomach, and a topical treatment had given her a rash. *Id*. Her symptoms had persisted after the steroid injection she received two months prior. *Id*. On examination, her right shoulder ROM was measured as 80 degrees in forward flexion, 60 degrees in abduction, and five degrees of external rotation. *Id*. at 6. Dr. Brazinski administered a steroid injection and provided home exercises. *Id*.

Petitioner saw her PCP on May 2, 2022. Ex. 6 at 2. Her PCP noted that she was seeing an orthopedist for her right shoulder pain that "seem[ed] to be a result of her flu shot." *Id*. at 4. She returned to Dr. Brazinski on May 11, 2022, reporting that the steroid injection had not been helpful and her condition was "about the same." Ex. 4 at 117-20. Dr. Brazinski noted that she had adhesive capsulitis, and that he would not recommend surgical intervention yet, and would not recommend further steroid injections because they had not been helpful. *Id*. at 120. He recommended that she exercise caution with daily activities, explaining that he did not recommend PT yet because she was "too sore to really tolerate it at this point." *Id*.

The following month (June 8, 2022), Petitioner returned to Dr. Brazinski, stating that she felt "about the same perhaps a little bit better." Ex. 4 at 113-16. She was now able to sleep at night, and rated her pain two out of ten. *Id*. at 115. On examination, her right shoulder external rotation had improved to 20 to 25 degrees (compared to five degrees previously). *Id*. at 116. He recommended that she continue home exercises, and return in six weeks. *Id*.

On August 19, 2022, Petitioner returned to Dr. Brazinski, now reporting that her condition was "a bit worse." Ex. 4 at 111. Pain was now waking her at least three times a night, and she had noticed a decrease in ROM in abduction (although her measured ROM on examination remained the same). *Id*. Dr. Brazinski noted that her symptoms had persisted for ten months and were worsening, and recommended manipulation under anesthesia, with possible rotator cuff repair if a tear was found. *Id*. at 112.

On September 6, 2022, Petitioner underwent right shoulder arthroscopy and manipulation under anesthesia with capsular release. Ex. 4 at 137-38. Her rotator cuff was found to be inflamed, but no tear was present. *Id*. at 138. Petitioner underwent a PT evaluation three days after surgery, on September 9, 2022. *Id.* at 104. She rated her pain four out of ten. *Id*. at 106. On examination, her right shoulder active ROM was 75 degrees in flexion and 40 degrees in abduction. *Id*.

Petitioner followed up with Dr. Brazinski on October 7, 2022. Ex. 4 at 66. She was doing "very well," reporting her pain as zero out of ten. *Id*. She was working hard in PT and was pleased with her progress. *Id*.

Petitioner attended approximately 16 PT visits between September 9 and October 28, 2022. Ex. 4 at 37-107. During this time, her pain levels ranged from zero to four out of ten. *Id*. at 38. When she was discharged from PT on October 28th, she rated her pain as one out of ten, and she exhibited active ROM of 130 degrees in flexion and 120 degrees in abduction. *Id*. She tolerated stretching well, and was deemed ready to be discharged, with instructions to continue her home exercises. *Id*.

Petitioner saw Dr. Brazinski on January 18, 2023, reporting that she was doing "very well," with "minimal to no pain." Ex. 4 at 158. On examination, she exhibited full ROM in forward flexion and abduction, but mild deficits in internal and external rotation remained. *Id*. at 159. He recommended that she continue home exercises for a few months, and follow up as needed. *Id*.

**B. Testimonial Evidence**

Petitioner submitted two affidavits in support of her claim. Exs. 9, 14. She states that her right shoulder pain began within 48 hours of vaccination. Ex. 14 at ¶ 4. When she saw her PCP a month after vaccination, she did not complain of arm pain "because I did not realize that I was experiencing anything more than normal, temporary, post-vaccination soreness." *Id*. After that visit, her partner asked why she did not tell her PCP about her pain, and she responded that she thought it would resolve on its own. *Id*. at ¶ 5.

Petitioner explains that her father died when she was two years old, and her mother did not have a car. Ex. 14 at ¶ 15. To go to the doctor, her aunt had to drive 15 miles to pick them up. *Id*. As a result, she explains that she learned that going to the doctor was a "big deal," and this "no doubt influenced me both to learn how to take care of physical ailments as best I could and to be prudent about seeking medical attention." *Id*. at ¶ 16.

John Esse, Petitioner's significant other, submitted an affidavit on her behalf. Ex. 15. He states that he saw Petitioner on the date of vaccination and "observed her discomfort and pain in her right shoulder." *Id*. at ¶ 6. Her pain became acute the next day, and continued to worsen over subsequent days. *Id*. at ¶ 7. When she saw her PCP a month after vaccination and did not mention her arm pain, he was "quite surprised – and frankly concerned." *Id*. at ¶ 8.

He explains that in hindsight, Petitioner's reluctance to address her pain with her PCP should not have surprised him, as she "tends to downplay physical ailments and is generally hesitant to seek medical attention." Ex. 15 at ¶ 10. He adds that over the following months, while she underwent assessments and treatments, Petitioner experienced not only pain, but also significant functional limitations. *Id*. at ¶ 11. She could not raise her right arm, lay on her right arm in bed, and could not get dressed without assistance due to her mobility limitations. *Id*. at ¶ 12.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

> administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

**B. Parties' Arguments on Entitlement**

Petitioner asserts that the record demonstrates that her shoulder pain began within 48 hours of vaccination, and meets the remaining requirements for compensation. Petitioner's Motion for Ruling on the Record, filed March 31, 2025, at *9-13 (ECF No. 35) ("Mot."). Although she did not mention her shoulder pain at her November 2021 PCP appointment, she explained that was because she still thought she was experiencing normal, temporary soreness that would go away without treatment. Mot. at *12. She emphasizes that she sought treatment less than two months after vaccination, and, at

that time and thereafter, consistently associated her shoulder pain with the subject vaccination. *Id*.

Respondent argues that Petitioner has not shown that her shoulder pain occurred within 48 hours of vaccination. Response, filed June 2, 2025, at *6-7 (ECF No. 36) ("Resp."). Respondent emphasizes that Petitioner did not report shoulder pain until nearly two months after vaccination. Resp. at *6. In the interim, she saw her PCP a month after vaccination and did not discuss shoulder pain, "weakening the temporal association" between vaccination and her injury. *Id*. And when she did seek care, she did not specify that her pain began within 48 hours of vaccination. *Id*.

Respondent further asserts that Petitioner's position on onset relies entirely on affidavit evidence. Resp. at *7. And he argues that these "interested-party" affidavits should be given little weight, as they were drafted during litigation and lack corroborating details and indicia of reliability. *Id*.

Petitioner replies that Mr. Esse is not an "interested party," as he has no pecuniary interest in Petitioner's financial status. Petitioner's Reply, filed June 16, 2025, at *2 (ECF No. 37) ("Reply").

### C. Factual Findings Concerning Onset

The record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Although she did not seek medical treatment for almost two months post-vaccination, such delay is not uncommon in SIRVA cases. *Tully v. Sec'y of Health & Human Servs*., No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset occurred within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs*., No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

Petitioner sought care for her shoulder pain less than two months after vaccination, relating her pain to that vaccination, and consistently attributed her pain to it as well. The fact that she saw her PCP for unrelated concerns a month after vaccination, and did not report her shoulder pain at that time is relevant to this determination, but more likely suggests that her pain was simply not all that severe (affecting damages) overall.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of right shoulder pain, or another condition, that would explain her post-vaccination symptoms. Exs. 6, 7, 8. She exhibited reduced ROM, and her symptoms were limited to the shoulder in which the vaccine was administered. Ex. 4 at 3. She experienced residual effects of her condition for more than six months. Ex. 4 at 3, 117. She received a covered vaccine in the United States. Ex. 12 at 2. And she states that she has never received compensation in the form of an award or settlement for her vaccine injuries, nor has she filed a civil action. Ex. 9 at ¶¶ 6, 7.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

[5] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

**B. Parties' Damages Arguments**

Petitioner seeks a pain and suffering award of $135,000.00,[6] citing decisions in *Holveck*, *Bidlack*, *Knudson*, *Nute*, *Smith*, and *Rafferty*, in which the petitioners were awarded between $100,000.00 and $127,500.00.[7] Mot. at *15-26. Petitioner asserts that her surgical procedure consisted of three "major aspects": manipulation under anesthesia, capsular release, and placement of two arthroscopic portals into her shoulder to evaluate her rotator cuff. *Id*. at *24. She calculates her "formal treatment" as continuing for 13 months, and adds that she underwent two cortisone injections (which did not provide relief), and experienced eleven months of pain and sleep disruption prior to surgery. *Id*. at *18-19. She continued home exercises for an additional three months at her orthopedist's direction. *Id*.

Respondent argues that Petitioner should receive a pain and suffering award of "no more than $60,000.00 to $90,000.00," citing decisions in *Klausen*, *Winkle*, and *Shelton*, in which the petitioners were awarded $60,000.00, $68,500.00, and $97,500.00, respectively.[8] Resp. at *11-16. Respondent views Petitioner's injury as moderate and limited in duration, and asserts that even if I find that Petitioner has established that her condition began within 48 hours of vaccination, her treatment delay should nonetheless be considered in arriving at a damages award. *Id*. at *11. Respondent asserts that during much of Petitioner's treatment course, she did not exhibit high pain levels, and after surgery she experienced a good recovery. *Id*. at *11-12.

Respondent asserts that the *Holveck* petitioner experienced a treatment course that was "far more protracted" than Ms. Bridges, continuing for over two years. Resp. at *13. And the *Bidlack* petitioner sought care just ten days after vaccination, and did not

---

[6] Petitioner appears to suggest that her award be based on prior awards, which are then adjusted for inflation, citing a North Carolina medical malpractice law and a comparison of the buying power of the awards in *Smith* and *Rafferty* at the time of the decisions to the present. Mot. at *22 n.5, 23 n.6; Reply at *9. To the extent that Petitioner requests that I adjust prior pain and suffering awards for inflation, I do not find this suggestion persuasive. *See, e.g., Jacobs v. Sec'y of Health & Human Servs*., No. 21-1997V, 2025 WL 2391063, at *5 (Fed. Cl. Spec. Mstr. July 15, 2025) (declining to adjust pain and suffering award for inflation).

[7] *Holveck. v. Sec'y of Health & Human Servs.*, No. 22-0095V, 2024 WL 5349130 (Fed. Cl. Spec. Mstr. Dec. 5, 2024); *Bidlack v. Sec'y of Health & Human Servs.*, No. 20-0093V, 2023 WL 2885332 (Fed. Cl. Spec. Mstr. Mar. 6, 2023); *Knudson v. Sec'y of Health & Human Servs.*, No 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018); *Nute v. Sec'y of Health & Human Servs.*, No 18-0140, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019); *Smith v. Sec'y of Health & Human Servs.*, No 19-1384V, 2022 WL 3012509 (Fed. Cl. Spec. Mstr. June 29, 2022); and *Rafferty v. Sec'y of Health & Human Servs.*, No 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020).

[8] *Klausen v. Sec'y of Health & Human Servs.*, No. 19-1977V, 2023 WL 2368823 (Fed. Cl. Spec. Mstr. Mar. 6, 2023); *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2022 WL 221643 (Fed. Cl. Spec. Mstr. Jan. 11, 2022); and *Shelton v. Sec'y of Health & Human Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

heal well after undergoing a manipulation under anesthesia, requiring two steroid injections after surgery. *Id*. Respondent views *Smith* as "an objectively more severe case" involving permanent post-surgical shoulder limitations documented by the petitioner's orthopedist. *Id*. at *14.

In reply, Petitioner asserts that two of the cases Respondent cites (*Klausen* and *Winkle*) are not surgical cases, and thus are not good comparable cases. Reply at *4-5. And *Shelton* is a surgical case, but involves a petitioner who did not seek care initially for *five* months, and then did not seek care again for another three months after that. *Id*. at *5. In contrast, once Ms. Bridges began treatment, she did not take any breaks in treatment. *Id*. As such, Petitioner asserts that *Shelton* is not "relevant or applicable." *Id*. at *6.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner's injury was largely resolved within one year of onset. She sought care two months after vaccination (not a major delay, if not all that prompt), and did not mention her pain at a PCP appointment in the interim. She treated her injury with surgery, two steroid injections (which did not relieve her pain), and 16 PT sessions. Her pain levels were generally on the lower side, usually ranging between zero and four out of ten, but were significant enough to disrupt her sleep. She sought care persistently, without gaps, and recovered well after surgery.

Of the cases cited by the parties, *Holveck* and *Bidlack* are the most similar. Both of those petitioners underwent a manipulation under anesthesia, apparently without arthroscopic procedures, while Ms. Bridges underwent the somewhat more invasive procedure of arthroscopic capsular release and portals to evaluate her rotator cuff (although no repair was found necessary). The *Bidlack* petitioner reported her injury sooner than Ms. Bridges, and underwent similar treatment otherwise, although her post-operative course was more difficult. The *Holveck* petitioner delayed seeking care for longer than Ms. Bridges, but sought treatment for several months longer, and otherwise underwent similar care.

Taking these factors into consideration, I find that an award of **$100,000.00** for pain and suffering is appropriate in this case, which involved an invasive surgical procedure but an overall successful treatment course.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $100,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[9] Additionally, I find that Petitioner is entitled to **$3,464.52 in unreimbursable expenses**.[10]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $103,464.52, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] The parties agree that this sum is reimbursable. Joint Status Report, filed July 9, 2026 (ECF No. 39).

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.